# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DON EICHMAN and JOE KRAMER, on behalf of themselves and others similarly situated,

        Plaintiffs,

v.

ARCHERY TRADE ASSOCIATION, INC.; BOWTECH INC.; HOYT ARCHERY, INC.; MATHEWS ARCHERY, INC.; PRECISION SHOOTING EQUIPMENT, INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTS INC. d/b/a JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; TRACKSTREET, INC.; and NEUINTEL LLC d/b/a PRICESPIDER f/k/a ORIS INTELLIGENCE,

        Defendants.

Case. No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Don Eichman and Joe Kramer ("Plaintiffs"), individually and on behalf of the Class defined below, brings this action against Defendants Archery Trade Association, Inc. ("ATA"), BowTech Inc. ("BowTech"), Hoyt Archery, Inc. ("Hoyt"), Mathews Archery, Inc. ("Mathews"), Precision Shooting Equipment, Inc. ("PSE," together with BowTech, Hoyt, and Mathews, the "Manufacturer Defendants"), BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"), Cabela's LLC ("Cabela's"), DICK's Sporting Goods, Inc. ("Dick's Sporting Goods"), Jay's Sports Inc. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods"), Kinsey's Outdoors, Inc. ("Kinsey's"), Lancaster Archery Supply, Inc. ("Lancaster Archery,"

together with Bass Pro Shops, Cabela's, Dick's Sporting Goods, Jay's Sporting Goods, and Kinsey's, the "Retailer Defendants"), TrackStreet, Inc. ("TrackStreet"), and NeuIntel LLC d/b/a PriceSpider f/k/a Oris Intelligence ("Oris," together with "TrackStreet," the "Software Defendants") (collectively, "Defendants"), and alleges, upon personal knowledge as to themselves and their own actions, and otherwise upon information and belief, including the investigation of counsel, as follows:

## I.    NATURE OF THE ACTION

1.    This class action arises from Defendants' unlawful agreement to raise, fix, maintain, and/or stabilize the prices of "Archery Products,"[1] purchased from one or more of the Manufacturer Defendants and/or Retailer Defendants from January 1, 2014, through the present (the "Class Period"), the exact dates being unknown to Plaintiffs.

2.    To carry out their price-fixing conspiracy, Defendants exchanged competitively sensitive, non-public information concerning, *inter alia*, seasonal sales numbers, prices, output, percentages of sales by product type, capacity, demand, sales volume, and future sales strategies.

3.    An agreement among horizontal competitors to share competitively sensitive, non-public information constitutes an unlawful information exchange in violation of Section 1 of the Sherman Act. The Manufacturer Defendants and Retailer Defendants' agreement to exchange confidential pricing data, sales, output, and demand, among

---

[1] As more fully detailed below, the term "Archery Products" as used herein refers to bows, arrows, arrowpoints, targets, and other archery-related equipment and accessories.

other information, served as an effective mechanism for enforcing a broader price-fixing scheme.

4.     The Manufacturer Defendants and Retailer Defendants implemented their conspiracy through their membership in the ATA—a professional trade association with a mission statement to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." The ATA has worked with the Manufacturer Defendants and Retailer Defendants to increase prices for Archery Products through adoption and enforcement of "minimum advertised price" ("MAP") policies.

5.     MAP policies establish a "floor" on the price at which retailers are permitted to advertise a given product for sale. They require widespread adoption across horizontal competitors to have a sustained impact on a product's price. Without widespread adoption and enforcement, competitors would have strong incentives to lower prices and gain more market share.

6.     Beginning in 2014, Defendants began pushing for adoption and enforcement of MAP policies throughout the Archery Products industry. The ATA was instrumental to promoting this effort and took steps to incentivize its members to adopt and enforce such policies.

7.     Pursuant to this arrangement, the Manufacturer Defendants and Retailer Defendants exchanged competitively sensitive information through the ATA. For example, information on price ranges and local market conditions were shared through a members-

only survey that the ATA began offering in 2022. Defendants would not have shared such information, absent a mutual agreement to do so.

8.      The competitively sensitive information disseminated through the ATA was accessible only to ATA members and was not available to the public. By sharing competitively sensitive information through the ATA and its affiliated software vendors—TrackStreet and Oris—the Manufacturer Defendants and Retailer Defendants were able to regularly monitor competitors' pricing and sales trends, thereby facilitating coordination and enforcement of supracompetitive pricing.

9.      Just as antitrust law prohibits direct exchange of competitively sensitive information among competitors aimed at stabilizing or controlling prices, it also forbids such exchange through intermediaries. The Manufacturer Defendants and Retailer Defendants cannot evade liability under the Sherman Act by outsourcing their information exchange to third parties.

10.     Sharing such competitively sensitive information was contrary to the unilateral self-interest of each Manufacturer Defendant and Retailer Defendant. The reciprocal and coordinated nature of the exchange reassured each participant that its rivals would also adhere to the conspiracy. This pervasive information sharing functioned as a critical mechanism for monitoring and enforcing cartel discipline.

11.     As a result of the alleged conspiracy, the Manufacturer Defendants and Retailer Defendants have been able to artificially suppress price competition, effectively driving higher retail prices.

12.    Plaintiffs paid higher prices to purchase Archery Products from one or more of the Manufacturer or Retailer Defendants during the Class Period than they would have paid in a competitive market absent the unlawful conspiracy and the conduct alleged herein.

## II.    PARTIES

### A.    Plaintiffs

13.    Plaintiff Don Eichman is citizen of Pennsylvania who purchased one or more Archery Products subject to a MAP policy during the Class Period, that were manufactured or sold by one or more Manufacturer Defendants or Retailer Defendants, at prices artificially inflated due to the anticompetitive conduct alleged herein. Mr. Eichman is an avid bow hunter.

14.    Plaintiff Joe Kramer is a citizen of Colorado who purchased one or more Archery Products subject to a MAP policy during the Class Period, that were manufactured or sold by one or more Manufacturer Defendants or Retailer Defendants, at prices artificially inflated due to the anticompetitive conduct alleged herein. Mr. Kramer is also an avid bow hunter.

### B.    Defendants

#### 1.    The Trade Association Defendant

15.    Defendant Archery Trade Association, Inc. ("ATA") is a corporation incorporated in Virginia with its principal place of business located at 117 South Valley, New Ulm, Minnesota. ATA is a members-only trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales,

and distribution of Archery Products. According to the ATA, one of its primary purposes is to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." The ATA participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States. Specifically, the ATA was instrumental to facilitating and encouraging the exchange of competitively sensitive information between and among the Manufacturer Defendants and the Retailer Defendants.

### 2.    The Manufacturer Defendants

16.    BowTech, LLC f/k/a BowTech, Inc. ("BowTech") is a Delaware limited liability company with its principal place of business located at 90554 Highway 99N, Eugene, Oregon. BowTech manufactures compound bows and archery related equipment that it sells throughout the United States, including in Colorado. Throughout the Class Period, BowTech was a member of the ATA, had a representative serving as a member of ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

17.    Hoyt Archery, Inc. ("Hoyt") is a corporation incorporated in Utah with its principal place of business located at 593 Wright Brothers Drive, Salt Lake City, Utah. Hoyt is a manufacturer of recurve and compound bows, among other products that it sells throughout the United States, including in Colorado. Throughout the Class Period, Hoyt was a member of the ATA, had a representative serving as a member of ATA's Board of

Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

18.    Mathews Archery, Inc. ("Mathews") is a corporation incorporated in Wisconsin with its principal place of business located at 919 River Road, Sparta, Wisconsin. Mathews is a manufacturer of compound bows and other archery related equipment that it sells throughout the United States, including in Colorado. Throughout the Class Period, Mathews was a member of the ATA, had a representative serving as a member of the ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

19.    Precision Shooting Equipment, Inc. ("PSE") is a corporation incorporated in Delaware with its principal place of business located at 2727 North Fairview Avenue, Tucson, Arizona. PSE is a manufacturer of compound bows and other archery related equipment that it sells throughout the United States, including in Colorado. Throughout the Class Period, PSE was a member of the ATA, had a representative serving on ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### 3.    The Retailer Defendants

20.    BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops") is a corporation incorporated in Delaware with its principal place of business located at 2500 E. Kearney Street, Springfield, Missouri. Bass Pro Shops is a sporting goods retailer that primarily

offers hunting, fishing, and other related outdoor recreation equipment. Bass Pro Shops has approximately 200 retail locations throughout the United States, including in Colorado. Throughout the Class Period, Bass Pro Shops was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

21.    Cabela's LLC ("Cabela's") was a Delaware limited liability company. In 2017, Bass Pro Shops purchased Cabela's and their headquarters were consolidated. As such, Cabela's principal place of business is also located at 2500 E. Kearney Street, Springfield, Missouri. Cabela's has stores throughout the United States, including in Colorado. Prior to its acquisition during the Class Period, Cabela's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

22.    Dick's Sporting Goods, Inc. ("Dick's Sporting Goods") is a corporation incorporated in Delaware with its principal place of business located at 345 Court Street, Coraopolis, Pennsylvania. Dick's Sporting Goods is a sporting goods retailer that primarily offers outdoor recreation equipment. Dick's Sporting Goods has approximately 200 retail locations throughout the United States, including in Colorado. Throughout the Class Period, Dick's Sporting Goods was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

23.    Jay's Sports, Inc. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods") is a corporation incorporated in Michigan with its principal place of business at 8800 S. Clare

Avenue, Clare, Michigan. Jay's Sporting Goods is a sporting goods retailer with two physical locations in Michigan and an internet storefront. Throughout the Class Period, Jay's Sporting Goods was a member of the ATA, had a representative serving on ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

24.    Kinsey's Outdoors, Inc. ("Kinsey's") is a corporation incorporated in Pennsylvania with its principal place of business at 1660 Steel Way Drive, Mount Joy, Pennsylvania. Kinsey's has a retail location and an internet storefront and distributes outdoor goods and Archery Products to more than 4,600 retailers across the United States, including in Colorado. Throughout the Class Period, Kinsey's was a member of the ATA, had a representative serving on ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

25.    Lancaster Archery Supply, Inc. ("Lancaster Archery") is a corporation incorporated in Pennsylvania with its principal place of business located at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster Archery describes itself as a "leading worldwide archery distributor," and has a retail location and an internet storefront. Throughout the Class Period, Lancaster Archery was a member of the ATA, had a representative serving on ATA's Board of Directors, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### 4.    The Software Defendants

26.    TrackStreet, Inc. ("TrackStreet") is a corporation incorporated in Delaware with its principal place of business located at 9811 W Charleston Boulevard, Suite 2-776, Las Vegas, Nevada. TrackStreet develops platforms designed to monitor brand activity online, offering business insights into online markets and pricing strategies. TrackStreet helps its clients located throughout the United States, including in Colorado, generate pricing policies, including MAP policies. It has described itself as offering "MAP monitoring software to track your products' online presence and enforce your policy against violators." Throughout the Class Period, TrackStreet assisted the other Defendants in establishing and enforcing their MAP policies and thus, participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

27.    NeuIntel LLC d/b/a Wayvia f/k/a PriceSpider f/k/a Oris Intelligence ("Oris") is a corporation incorporated in California with its principal place of business located at 4000 Barranca Parkway, Suite 250, Irvine, California. Oris helps its clients located throughout the United States, including in Colorado, generate pricing policies, including MAP policies. Oris has touted its MAP monitoring software, "Prowl", as providing continuous, real-time tracking of online pricing behavior to support MAP compliance. Throughout the Class Period, Oris assisted the other Defendants in establishing and enforcing their MAP policies and thus, participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### III.    JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a); Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and Section 1 of the Sherman Act, 15 U.S.C. § 1.

29.    Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b)–(d), because, during the Class Period, one or more Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district.

30.    This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

31.    Defendants' activities were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

### IV.    FACTUAL ALLEGATIONS

#### A.    The Market for Archery Products

32.    As used herein, "Archery Products" refers to the full range of equipment that consumers use for recreational archery, competitive archery, and bowhunting. This includes, but is not limited to, the following product categories:

1) Bows, including compound bows, recurve bows, longbows, bowfishing bows, and crossbows, and their associated components;

2) Arrows and crossbow bolts, as well as their components, such as shafts, fletching, and nocks (excluding arrowheads);

3) Arrowheads and arrowpoints, such as broadheads and field points;

4) Targets, including bag, foam, and 3D models; and

5) Archery accessories, such as bow cases, quivers, sights, scopes, and stabilizers.

33.    The U.S. market for Archery Products is substantial. In 2024, it was estimated to exceed $1.2 billion, with continued growth expected. A 2020 National Participation Survey from the ATA estimated there were approximately 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers in the United States over the age of fifteen.

34.    Government programs have also supported archery's growth. Since 2002, the National Archery in the Schools Program has introduced archery to more than 1.3 million students across more than 9,500 schools nationwide.

35.    Despite increasing interest, high consumer prices constrain growth. Entry-level bows typically cost between $150 and $300. Standard compound bows at Cabela's, for example, range between $300 and $400, with some models starting around $200 and premium models reaching $900.

36.    The relevant geographic market for all claims is the United States. The alleged conspiracy affected prices nationwide, impacting consumers throughout the

country, including in Colorado. Accordingly, it is appropriate to assess the competitive effects of Defendants' MAP policies on a national basis. This approach also promotes efficiency by allowing the competitive effects of the policy to be evaluated across the entire market, rather than attempting to disaggregate by submarket or region.

37.    Defendants and their co-conspirators possessed significant market power at every level of the U.S. Archery Products market, including manufacturing, distribution, and retail. Accordingly, they were able to impose sustained price increases above competitive levels without losing a meaningful number of sales. This market power prevented consumers from turning to alternative suppliers or substituting products in sufficient numbers to constrain pricing.

38.    This lack of substitutability is reinforced by the unique appeal of bow sports. On archery forums such as Archery Talk, bowhunters frequently describe a strong preference for bowhunting over other methods, including firearm-based hunting. They emphasize the added challenge and enjoyment, making it unlikely that archery consumers would shift to other products or sports in response to price increases.

**B.    The ATA's Organization and Role in the Archery Products Industry**

39.    The ATA is the central trade group for the Archery Products industry. It is composed exclusively of businesses—primarily manufacturers, distributors, and retailers. Individual consumers are not eligible to join. According to the ATA's website, as of 2023, its membership exceeded 2,500 businesses, up from approximately 2,100 in 2015 and only 505 in 2000.

40.    Roughly 80% of the ATA members operate within the Archery Products supply chain, meaning they manufacture, distribute, or sell Archery Products. These entities are horizontal competitors, meaning that, absent collusion, they would compete against one another.

41.    The ATA provides its members with multiple structured forums to interact and communicate. These include the ATA Board of Directors, the Retail Council, the annual ATA Trade Show, as well as digital forums, such as "ATA Connect." Each of these platforms enables competitors to devise, incorporate and enforce MAP policies across the Archery Products industry. Each of these vehicles for coordination is described below.

### 1.    Board of Directors

42.    The ATA is governed by a Board of Directors comprised of representatives from across the Archery Products supply chain, including manufacturers, distributors, and retailers. Any "regular" member company—which includes all supply chain ATA Members—may nominate its CEO or another senior leader for election to the Board. While individual executives are elected, board seats are assigned to the member companies themselves, allowing for continuity of representation if the designated individual departs.

43.    Throughout the 2010s and into the Class Period, major manufacturers, distributors, and retailers held Board seats concurrently. For example, Manufacturer Defendants BowTech, Hoyt, Mathews and PSE all had representatives on the Board from 2018–2019, and Retailer Defendants Bass Pro Shops, Jay's Sporting Goods, and Kinsey's were all board members in 2018.

44.    The Board of Directors is responsible for setting the ATA's strategic direction and overseeing key organizational functions. These include approval of ATA bylaws, enforcement of the ATA Code of Conduct, and governance of association-wide initiatives such as the ATA Trade Show and MAP policy discussions. In practice, the Board serves as a central decision-making forum where representatives of market participants shape pricing policy, coordinate marketing strategies, and influence the ATA's public and private advocacy.

### 2.    Retail Council

45.    In May 2016, the ATA Board reestablished the Retail Council as a permanent advisory body intended to "provide more guidance and support to the organization's retail members" and to "improve the industry's archery and bowhunting markets." The Council consists of representatives from leading archery retailers, including the Retailer Defendants.

46.    Mark Copeland, General Manager of Defendant Jay's Sporting Goods, has served as Chair of the Retail Council and a member of the ATA Board. He publicly characterized the Council as a platform for collective action, stating the need for "an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive."

47.    The Council meets regularly to address current retail issues and discuss topics tied to the ATA's strategic planning. One recurring topic of discussion has been the adoption and enforcement of MAP policies. The ATA's Director of Industry Relations, Kurt Smith, has publicly advised retailers to enforce MAP rigorously, recommending that

retailers and distributors "catch violators," "cut them out of the supply chain," and "force them to look for easier prey."

### 3. Trade Show

48.    The ATA Trade Show is the largest industry gathering in the archery and bowhunting sector. It is a members-only event attended by manufacturers, distributors, and retailers from across the country. The 2016 ATA Trade Show, for example, included representatives from over 1,100 companies, with every major bow manufacturer in attendance.

49.    The Trade Show provides a regular opportunity for supply chain ATA members to meet in person and engage in formal and informal discussions about industry practices. MAP policy has frequently been a topic of discussion at these events. At the 2015 ATA Trade Show, for example, around 60 representatives of ATA-member manufacturers, distributors, and retailers attended a meeting to review a sample MAP policy.

### 4. ATA Connect

50.    In 2017, the ATA launched "ATA Connect," a private, members-only online discussion community designed to facilitate year-round communication among manufacturers, distributors, and retailers. The ATA described ATA Connect as a platform to help members "build peer connections and talk regularly with like-minded business owners." ATA Connect allowed Defendants and their co-conspirators to engage in private discussions about pricing, buying patterns, profit margins, inventory levels, and other competitively sensitive subjects.

51.     ATA Connect provides at least two sub-communities: MyATA Network and the Retail Growth Interact community. The former was accessible to all ATA members, while the latter was "exclusive to ATA-member retailers."

52.     In promotional materials on its website, the ATA explicitly encouraged members to use ATA Connect to start discussions about MAP policies with their peers.

53.     In 2018, the ATA added a polling feature to ATA Connect, which allowed users to assess where other members stood on various industry issues.

**C.     Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Archery Products in the United States.**

54.     Beginning no later than January 1, 2014, Defendants entered into an agreement to raise, fix, maintain or stabilize the prices of Archery Products sold in the United States.

55.     In the years leading up to the formation of the conspiracy, members of the ATA and Defendants became concerned about retail price competition for Archery Products, and the downward pressure competition placed on prices and profitability.

56.     In response to these competitive pressures that were driving down prices and profit margins, the Manufacturer and Retailer Defendants, with the assistance of the ATA and other co-conspirators, coordinated the adoption and strict enforcement of MAP policies.

57.     These efforts were designed to insulate pricing from market forces and succeeded in elevating prices to supracompetitive levels throughout the Class Period.

58.    Defendants used the ATA and its platforms to organize and implement this coordinated effort. Starting in 2014, the Manufacturer and Retailer Defendants relied on the ATA to push widespread adoption of MAP policies and to assist in their enforcement.

59.    This conduct was central to a shared strategy to curb price competition and protect profitability. The result was a market in which Archery Product prices remained artificially high, to the detriment of consumers nationwide.

**1.    The ATA Facilitated and Encouraged Widespread Adoption of MAP Policies**

60.    Although some MAP policies had existed in the Archery Products industry prior to the formation of the conspiracy, they were largely ineffective on an individual basis. Without broad adherence and enforcement across the market, unilateral MAP policies failed to deliver meaningful results.

61.    In the early 2010s, the Archery Product market remained relatively competitive, in part because no coordinated enforcement of MAP policies had yet emerged. Industry participants, however, increasingly called on the ATA to play a more active role in facilitating collective action.

62.    At first, the ATA was hesitant. In 2011, the only action the ATA had taken or intended to take involved "providing all ATA members a chance to have a voice and weigh in on MAP, which is a highly sensitive and potentially controversial issue."

63.    ATA CEO McAninch acknowledged that, "as a membership organization," the ATA could not serve as a MAP enforcer. Instead, he explained that the ATA's role was "to promote business practices that are best for everyone" and to urge members to work collectively toward that end. He observed: "By giving dealers a chance to talk openly

about pricing issues in a forum and being sure manufacturers have a chance to hear and react to any concerns raised, we think this problem can be substantially improved."

64.     That position, however, began to shift in 2014. Under mounting pressure from its members—and with the addition of powerful retailers Cabela's and Bass Pro Shops to its Board—the ATA adopted a more aggressive stance. With two of the largest Archery Product retailers now guiding its leadership, industry participants could be confident that if they adopted and enforced MAP policies, their competitors would follow suit.

65.     In late 2014, the ATA began encouraging its members to implement MAP policies and underscoring the need for coordinated enforcement across the industry. In a December 31, 2014, blog post, ATA CEO Jay McAninch warned that "[u]nited we stand, divided we fall," and asserted that to deal with the MAP issue, "our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed."

66.     McAninch specifically positioned the ATA as the central hub for this coordinated effort, identifying it as the "right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes."

67.      In that same blog post, he noted that the ATA would offer a model MAP policy for manufacturers, which it framed as a legally defensible template that companies could "use as a tool."

68.     On January 10, 2015, during the ATA's annual Trade Show, McAninch convened approximately 60 representatives from manufacturing, retail, and distribution sectors to review a sample MAP policy that companies could use as a starting point.

69.     During that seminar, the ATA delivered the message that "[i]f ATA members want to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products, each business must create its own policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

70.     Soon after, the ATA distributed a newsletter reiterating its commitment to MAP enforcement and offering a "three-step plan" to help members craft their own "customized" MAP policies. These materials were promoted broadly, including through public channels such as Twitter.

71.     By 2016, the ATA was openly offering "resources about creating a MAP policy" to its members and promoting itself as a trusted guide for MAP adoption and enforcement. Those resources were restricted to ATA members and presented as part of the value of membership, reinforcing the industry-wide nature of the campaign.

### 2.     Expanded Means to Enforce MAP Policies

72.     Manufacturers and retailers followed the ATA's signals. For example, in June 2015, Retailer Defendant Kinsey's publicly announced its new MAP policy, stating that "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers."

73.     The success of Defendants' MAP policies—and the broader effort to fix and stabilize prices of Archery Products—relied heavily on coordinated enforcement across

all levels of the supply chain. Since many Archery Product resellers source goods from intermediaries rather than directly from manufacturers, MAP policies could not be effective unless distributors and large retailers agreed to enforce them. Manufacturers therefore reached agreements with distributors and retailers to assist in monitoring compliance and to take punitive action against violators.

74.    Statements from industry participants make clear that this coordinated MAP enforcement was well understood and embraced. In June 2015, for example, manufacturer TenPoint Crossbow Technologies publicly commended Defendant Kinsey's for its role in enforcing MAP policies, stating: "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

75.    T.R.U. Ball Archery ("T.R.U."), an Archery Products manufacturer and ATA member, illustrates how MAP enforcement policies were implemented to restrict retail price competition. By 2017, T.R.U. had adopted a detailed enforcement structure targeting both retailers and distributors, designed to deter deviations from MAP pricing and promote uniform adherence across the market.

76.    For retailers, the policy began with a warning for any "New MAP Violator," followed by a two-week period during which the violator would be "evaluated… to determine if they have raised prices to MAP levels." If the retailer had previously been notified of a MAP violation within the prior six months, a "[f]irst repeat infraction" triggered a "48 hour warning to raise prices to MAP levels." Failure to comply resulted in placement

on the "T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days."

77.     The penalties escalated with each repeat violation. A "[s]econd repeat infraction" resulted in a 60-day suspension: "Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the … Do Not Sell List … for 60 days." For "[t]hree or more repeat infractions," the policy imposed the most severe penalty: the violator would remain on the Do Not Sell List "for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days."

78.     T.R.U. also imposed MAP-related obligations on distributors who supply products to retailers. The company stated it would be "using contacts from around the United States to purchase products from sources who are known to be violating MAP levels." Distributors found to be supplying companies on the Do Not Sell List were subject to similar discipline: a "[f]irst infraction" resulted in a 30-day suspension, while a "[s]econd infraction" triggered an additional 60-day placement on the Do Not Sell List.

79.     T.R.U.'s structured enforcement schedule exemplifies how Defendants maintained pricing discipline and ensured that MAP policies would be enforced collectively.

**D.     Retailer Influence Over the ATA and Industry-Wide MAP Coordination**

80.     The ATA's transformation from a trade association that merely discussed pricing issues into the central organizing force behind a coordinated industry-wide MAP

promulgation regime coincided with a significant expansion of retailer influence within the organization.

81.     Retailers, who stood to gain the most from inflated prices and expanded margins, quickly became some of the most aggressive proponents and enforcers of MAP policies. Indeed, ATA officials later acknowledged that most MAP enforcement pressure came from the retail side.

82.     Retailers' growing influence over the ATA was further institutionalized over the next several years. In 2016, the ATA reinstated its Retail Council, which convened in Minneapolis that May for a strategic planning summit with nearly 40 retail representatives in attendance. McAninch emphasized that the industry's success "depends largely on the success of archery and bowhunting retailers." The chairman of the Retail Council, Mark Copeland, encouraged retailers to work together, stating: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

83.     In July 2017, the ATA Board added seats for representatives from two powerful retailer buying groups: the National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). McAninch celebrated the move, stating that their presence would "ensure ATA Board discussions are balanced, and consider all aspects of business in our industry." The leaders of both organizations praised the expanded influence of retailers within the ATA and expressed optimism that this would improve coordination with manufacturers to protect retail profits. ARRO's executive

secretary noted that the ATA had "been working to help retailers be more profitable," while NABA's president called the changes to the archery business "refreshing to see."

84.     In its official messaging, the ATA routinely encouraged retailers to push manufacturers to adopt MAP policies and offered them tools to do so. A now deleted ATA article titled "MAP: What Is It? Why Does It Exist?" praised MAP policies as beneficial for the industry and at the same time underscored the harm caused by violations: "The Archery Trade Association's Board of Directors and its Retail Council members are discussing how to solve problems pertaining to MAP violations and ensure the longevity of brick-and-mortar retailers."

85.     ATA Board and Retail Council members were explicit about the financial motive behind the coordinated MAP regime. Ryan Shutts, Cabela's merchandising director and an ATA Retail Council member, was quoted in the article as stating that "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." From the outset, the article makes its message clear: "if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business."

**E.     ATA's Role in Facilitating MAP Enforcement Through Software Co-Conspirators**

86.     In 2017, the ATA expanded its role in facilitating the enforcement of MAP policies by introducing a suite of centralized tools and third-party services to help members monitor and punish price deviations. In October 2017, ATA launched a members-only "MAP Resource Library," which compiled MAP policies from manufacturers and made them accessible to all member retailers and distributors. This repository

enabled members to identify which manufacturers had adopted MAP policies and provided detailed guidance on how to comply with and enforce those policies.

87.    To further support MAP enforcement, the ATA publicly partnered with software vendors TrackStreet and Oris, promoting discounted access to their price-monitoring platforms. These platforms used web crawlers and surveillance tools to "scour the internet" for MAP violations and send violation notices. The ATA marketed these services as essential to ensuring MAP compliance, stating on its website that "MAP policies are only effective if they're enforced," and offering discounted rates for members.

88.    TrackStreet advertises its MAP monitoring and enforcement tools as "infinitely customizable," allowing clients to choose the degree of automation in handling violations. Through its platform, users gain the ability to "move faster, enforce your resale policies more effectively, and…truly regain control of your market."

89.    Oris has marketed its MAP monitoring tool, Prowl, as a real-time solution that ensures no MAP violator evades detection. The platform automatically scans seller listings every three hours, seven days a week. According to Oris CEO, Pam Springer, some sellers "try to play games after 5 p.m. or on weekends," but "[w]ith Prowl, no one gets away with that."

90.    The software benchmarks data, flags violations, and supplies actionable insights to ensure consistent enforcement of pricing restrictions. Prowl also equips manufacturers with enforcement tools, including integration with company email systems for issuing customized notices and automated bulk violation communications.

91.     The ATA promoted these software partners in press releases, social media, and its official podcast. In a March 2019 episode of "Beyond the Bow," the podcast series produced by the ATA and hosted by its Director of Industry Relations, Kurt Smith, Smith and the VP of Sales for TrackStreet, Erickson, openly discussed the vital role MAP policies play in maintaining brand value. Throughout the conversation, Erickson stressed the importance of industry-wide adoption, implementation, and enforcement of MAP policies. He also emphasized the crucial role larger firms can play in influencing others: "As soon as a couple big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

92.     The MAP Resource Library and software partnerships were designed and promoted to help manufacturers and retailers implement and enforce MAP policies, reduce competition, and maintain artificially high prices across the Archery Products industry.

**F.     Defendants Signaled Commitment to MAP Enforcement**

93.     By 2019, Defendants were openly signaling to other ATA members to join the conspiracy. In trade publications, press interviews, and public statements, they touted MAP enforcement as central to their profitability and success, and reaffirmed the need for collective action to sustain high prices. These public affirmations served to signal their commitment to the conspiracy and to reassure co-conspirators that price floors would be enforced throughout the industry.

94.     For example, in 2019, T.R.U. executive Ben Summers attributed the company's "really high" 2018 sales to "good MAP policies and relentless enforcement."

26

These sentiments resonated throughout the industry. The ATA's Director of Industry Relations, Kurt Smith, stressed that "enforcing MAP will never get easier," and emphasized the importance of ATA members working together "as much as possible."

95.    Some Defendants used interviews in Inside Archery to signal their adherence. In 2019 and 2020 issues, Victory Archery, PSE, and Performance Archery each reiterated the importance of MAP policies and enforcement to their business models.

96.    Even as the ATA deleted some of its more explicit MAP-related webpages beginning in 2021, it continued to offer support to members on how to "develop a MAP policy" as well as discount programs for members to hire outside vendors to police MAP violators.

### G.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act

97.    The exchange of competitively sensitive information among horizontal competitors can independently violate Section 1 of the Sherman Act, even in the absence of an express agreement to fix prices. As the Supreme Court has recognized, "[e]xchanges of current price information . . . have the greatest potential for generating anti-competitive effects and . . . have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also United States v. Container Corp. of Am.*, 393 U.S. 333, 336–38 (1969) (information exchange unlawful where it had anticompetitive effect despite no agreement to adhere to prices); *American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921).

98.     Federal enforcement agencies have likewise made clear that information exchanges among competitors raise serious antitrust concerns, especially when the data exchanged relates to price, output, inventory levels, costs, or strategic plans.

99.     In December 2023, the Federal Trade Commission and DOJ jointly withdrew the Antitrust Guidelines for Collaboration Among Competitors and explained that "[t]he Agencies are committed to vigorous antitrust enforcement on a case-by-case basis in the area of competitor collaborations because such collaborations can harm competition and subvert the competitive process."

100.     The DOJ has also specifically warned that "indirect exchanges of information through intermediaries," such as trade associations, "can have the same anticompetitive effect as direct communications among competitors."

101.     Here, the ATA created and maintained a complex network of information-sharing mechanisms through which the Manufacturer Defendants and Retailer Defendants routinely exchanged sensitive, non-public business information with the purpose and effect of coordinating pricing and suppressing competition.

102.     For example, in 2019, the ATA launched "My ATA Network," a members-only forum in which distributors, manufacturers, retailers, and other ATA members could discuss competitively sensitive information.

103.     In 2022, the ATA introduced the "Quarterly Retail Business Tracker Survey" to collect valuable insights on retail product sales, pro shop trends and customer demographics from ATA-member retailers. The ATA then compiled the data into "easy-to-

read" reports with charts and graphics and redistributed them to all ATA members, including competing retailers, manufacturers, and distributors.

104.    The reports generated from the Retail Business Tracker Survey contained non-public, detailed information, including overall sales, types of sales and customer demographics, as well as data on product category sales, bow type, bow price ranges, customer experience level, and services (coaching, bow technician work, etc.). The ATA promoted these reports as providing valuable data about market trends.

105.    Until 2024, these reports were "free for ATA members" and distributed exclusively through the ATA Member Dashboard and Resource Library. The ATA required applicants for membership to verify that they were industry participants—such as retailers, manufacturers, or distributors—before gaining access. Non-members could purchase reports, but the survey was never available to consumers.

106.    Through these tools and services, the ATA not only created the infrastructure for an ongoing horizontal conspiracy, but it also allowed Defendants and their co-conspirators to share competitively sensitive information, with the purpose and effect of increasing, stabilizing, or otherwise manipulating the price of Archery Products.

107.    The structure of the Archery Products industry makes it particularly vulnerable to collusive harm from information exchange. The market is concentrated, demand is relatively inelastic, and products are largely interchangeable. In such conditions, the sharing of granular competitively sensitive data substantially increases the risk of coordinated pricing.

**H.      Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Class Members to Suffer Antitrust Injury and Damages**

108.    Defendants and their co-conspirators, through their ongoing exchange of competitively sensitive information and their coordinated implementation and enforcement of MAP policies, succeeded in raising, fixing, and stabilizing prices for Archery Products across the United States. As a result, consumers such as Plaintiffs and Class members were forced to pay supracompetitive prices for Archery Products during the Class Period.

109.    MAP policies harm competition in two primary ways. First, when adopted by a critical mass of horizontal competitors, MAPs eliminate incentives to compete on price by prohibiting retailers from advertising prices below the manufacturer's designated "minimum." This restricts the ability of retailers to attract customers by advertising lower prices, even when they may, in fact, be offering discounts through coupons or "in-cart" pricing. Second, MAPs functionally raise the "starting point" for any discount negotiations, such that even discounted products are priced above competitive levels.

110.    ATA members have publicly acknowledged that MAPs increase retail margins and restrict downward price pressure. As Kinsey's stated in 2015, "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers." Similarly, Randy Wood of TenPoint Crossbow Technologies praised Kinsey's for supporting MAP enforcement, stating it "help[s] the retailers maintain a solid profit margin."

111.    Defendants' information exchange further amplified the anticompetitive effects of their MAP coordination. By sharing competitively sensitive information relating

to inventory levels, supply trends, and business performance, Defendants were able to coordinate their MAP enforcement strategy more effectively. Without such insights into competitors' conduct and conditions, Defendants would not have been able to effectively enforce MAP policies, and therefore the conspiracy itself.

112.    While the ATA claims that MAPs are designed to shift competition from price to service, the very channels it created, such as ATA Connect and Retail Growth Interact, encouraged retailers to coordinate on the prices of those services. For example, the ATA has advertised Retail Growth Interact as a members-only forum where retailers could exchange information on key business topics, including buying patterns, profit margins, and pricing for services.

113.    This open coordination on both product and service pricing among horizontal competitors, all facilitated by the ATA, significantly reduced price competition in many segments of the Archery Products market.

114.    Throughout the Class Period, market participants have acknowledged the artificial nature of pricing in the industry. In one 2016 post on Archery Talk, an online forum and community dedicated to archery, an Archery Products retailer described soaring costs for consumers: "Today vertical bows are exceeding [$]1,000–1,500 on a regular basis, a dozen crossbow arrows are over $80 and can cost up to 250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for hunting arrows…X10 Pro Tours are over $400 for bare shafts, points can be around $300. The average pay hasn't moved much in years is archery overpriced, absolutely."

115.    Similar posts from industry participants have confirmed that MAP policies are used to maintain fixed prices under threat of exclusion. For example, one retailer posted on Archery Talk: "Many MAP agreements state that you are more than able to sell below MAP but if you do you will simply not be allowed to sell the product. Quite a few dealers have found out their sources simply will not sell to them after violating MAP. The reality is that many MAP agreements (Scorpyd or Tenpoint for example) are actually MRP (minimum retail price)."

116.    Numerous consumers and retailers have observed the soaring cost of Archery Products as a result. In 2017, trade press reported widespread consumer frustration with the escalating retail prices of compound bows, describing them as excessive and disconnected from what buyers could afford. The same reporting observed that declining sales had led dealers to press manufacturers for higher margins per unit, with some bow makers noting that retailers were now demanding significantly greater profits on each sale than in prior years.

117.    Posts on popular hunting and archery forums have expressed similar complaints. In recent years, forum threads with titles such as "Archery industry prices too high?" and "Are target compound bow prices too inflated?" have appeared regularly on Archery Talk. In one discussion titled "Cost of bows" from 2024, a participant noted that "[b]ow manufacturers are proudly making bows over the two thousand dollar price range."

118.    There is no legitimate procompetitive justification for this conduct. These agreements and information exchanges served no purpose other than to distort pricing, reduce competition, and raise profit margins at the expense of American consumers.

119. Defendants' conduct has had, and continues to have, substantial anticompetitive effects, including reduced price competition, inflated retail prices, suppressed market entry, and diminished consumer choice in the market for Archery Products.

## V. CLASS ALLEGATIONS

120. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class, which is defined as follows:

> All persons and entities in the United States and its territories who purchased Archery Products from the Manufacturer Defendants or Retailer Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2014, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

121. The Class definition provides clear, objective criteria understood by Class members and Defendants, and it allows the parties to identify the members of the Class.

122. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

123. **Numerosity.** The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contain tens of thousands of similarly situated proposed Class members. The Class members are readily identifiable and are ones for which records should exist.

124. **Typicality.** Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

125. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to purchase Archery Products than they otherwise would have in a competitive market.

126. **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are not antagonistic to the Class. Plaintiffs are willing and able to assume the duties of class representatives to protect the interests of all Class members. In addition, Plaintiffs' counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

127. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual Class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

128. Questions of law and fact common to the Class include:

> 1) Whether Defendants entered into a formal or informal contract, combination, conspiracy, or common understanding to fix, inflate, maintain or stabilize the prices of Archery Products from competitive levels;

2)      Whether such agreement constituted violations of the Sherman Antitrust Act;

3)      If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated the price of Archery Products from competitive levels;

4)      The proper measure of damages; and

5)      The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

129.    Plaintiffs are represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

130.    **Superiority.** Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

131. **Injunctive Relief.** Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VI.    EQUITABLE TOLLING & ESTOPPEL

132.    Throughout the Class Period, Defendants knowingly and actively concealed their unlawful and anticompetitive conduct, thus tolling any applicable statute of limitations. The conspiracy itself was also inherently self-concealing.

133.    Defendants attempted to characterize their horizontal price-fixing agreement as simply "MAPs" when, in fact, they were part of Defendants' conspiracy to artificially inflate prices and restrict competition at the retail level.

134.    In addition, Defendants' scheme to enforce industry-wide MAPs was conceived and implemented behind closed doors, inter alia, at ATA annual Trade Shows and meetings closed to the general public. Defendants further relied on members-only forums, Trade Shows, reports, and communications to adopt, implement, and enforce industry-wide MAP policies and share competitively sensitive information. Plaintiffs and other consumers had no access to this information or these exchanges.

135.    Moreover, as noted above, the ATA deleted some of its more explicit MAP-related webpages beginning in 2021, concealing its role in coordinating and enforcing industry-wide MAP policies.

136.    As a result, Plaintiffs did not discover—nor could they have discovered through the exercise of reasonable diligence—the existence of the unlawful conduct alleged herein prior to retaining counsel in 2025.

**VII.    CLAIMS FOR RELIEF**

<b>COUNT I:<br>
PRICE FIXING<br>
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)<br>
(On Behalf of Plaintiffs and Class Members)</b>

137.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138.    Beginning at least as early as January 1, 2014, and continuing through the present, Defendants entered into and engaged in an unlawful contract, combination, or conspiracy, in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

139.    The unlawful contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, stabilize, and/or maintain prices for Archery Products at artificially inflated levels. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the market for Archery Products in the United States.

140.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

141.    This conduct constitutes a per se violation of Section 1 of the Sherman Act. In the alternative, Defendants' conduct is unlawful under either a "quick look" or full rule of reason analysis, as the agreement is inherently anticompetitive and lacks any plausible

37

procompetitive justification. To the extent Defendants assert any such justification, it could have been achieved through significantly less restrictive means.

142.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered and will continue to suffer injury in the form of overcharges for Archery Products.

143.    Plaintiffs and Class members are entitled to treble damages, reasonable attorneys' fees and costs, and injunctive relief to end the ongoing antitrust violations described herein.

**COUNT II:**
**UNLAWFUL INFORMATION EXCHANGE**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(On Behalf of Plaintiffs and Class Members)**

144.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

145.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2014, and continuing through the present, Defendants entered into and engaged in an unlawful contract, combination, or conspiracy, in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

146.    The unlawful contract, combination, or conspiracy consisted of the regular and systematic exchange of competitively sensitive information between and among Defendants through the ATA and MAP policies.

147.    Defendants' conduct in furtherance of the unlawful information exchange described herein was authorized, ordered, or executed by their officers, directors, agents,

employees, or representatives while actively engaging in the management of Defendants' affairs.

148.    This conduct constitutes a per se violation of Section 1 of the Sherman Act. In the alternative, Defendants' conduct is unlawful under either a "quick look" or full rule of reason analysis, as the exchange of competitively sensitive information is inherently anticompetitive and lacks any plausible procompetitive justification. To the extent Defendants assert any such justification, it could have been achieved through significantly less restrictive means.

149.    As a direct and proximate result of Defendants' unlawful information exchange, Plaintiffs and Class members have suffered and will continue to suffer injury in the form of overcharges for Archery Products.

150.    Plaintiffs and Class members are entitled to treble damages, reasonable attorneys' fees and costs, and injunctive relief to end the ongoing antitrust violations described herein.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request judgment against Defendants, as follows:

A.      That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

B.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined

and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

C.      That Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

D.      That Plaintiffs and the Class be awarded such other and further relief as the case may require and the Court may deem just and proper.

## IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury on all issues so triable.

Dated: August 22, 2025

Respectfully submitted,

/s/ Eric Olson

Eric Olson
Sean Grimsley
Kenzo Kawanabe
**OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151
eolson@olsongrimsley.com
sgrimsley@olsongrimsley.com
kkawanabe@olsongrimsley.com

Kimberly A. Justice
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6486
kjustice@fklmlaw.com

Matthew W. Ruan *(admission forthcoming)*
Douglas A. Millen *(admission forthcoming)*
Samantha M. Gupta *(admission forthcoming)*
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
sgupta@fklmlaw.com

*Counsel for Plaintiffs and the Proposed Class*